**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
───────────────────────────────

**UNITED STATES OF AMERICA,**

                  **Plaintiff,**

                  **v.**                        **05-CR-55A(Sr)**

**TROY GILLON,**

                  **Defendant.**
───────────────────────────────

## REPORT, RECOMMENDATION AND ORDER

This case was referred to the undersigned by the Hon. Richard J. Arcara, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.

## PRELIMINARY STATEMENT

The defendant is charged in a one count indictment with having violated Title 21 U.S.C. § 841(a)(1).  (Docket #5).

On February 2, 2005, at approximately 7:05 p.m., the defendant was arrested by members of the Career Criminal Task Force ("CCTF") in the parking lot of the Marriott Hotel located at 1340 Millersport Highway, Amherst, New York and placed in the back seat of an Amherst Police patrol vehicle which was equipped with a recording system.   At approximately 8:00 p.m., the defendant was transported back to the offices of the CCTF for debriefing and at approximately 8:25 p.m., the defendant advised Officer Daniel Granville and Special Agent Peter Orchard that he acquired the

cocaine that CCTF personnel recovered at the south side of the Red Roof Inn from his cousin, Trent Hamilton, and that he owed Hamilton $7,500.00.  (Docket #1, ¶ 11).

The defendant filed a motion seeking suppression of the statements he made to police officers while in custody.  (Docket #9).  The government opposed the motion, claiming that the admissions made by the defendant were voluntary and made after he had been advised of his rights.  (Docket #10).  The Court reviewed the transcript of the compact disc recording of the interrogation of the defendant by Officer Dennis Gilbert when the defendant was first arrested and placed in the Amherst Police patrol vehicle at the scene of the arrest and determined "that it cannot be stated with reasonable, legal certainty at this time that the defendant was adequately advised of his rights and that he knowingly and voluntarily waived those rights."  (Docket #19). Accordingly, the Court ordered a hearing, which was conducted on September 27, 2005.  (Docket ##23 & 25).

Upon consideration of all of the evidence presented to the Court, as set forth and analyzed below, it is recommended that the defendant's motion to suppress be granted.

## **FACTS**

Dennis Gilbert testified that on February 2, 2005, he was employed in the Department of Public Safety for the Buffalo Municipal Housing Authority ("BMHA"), and assigned to the CCTF, which was investigating a drug transaction involving the

defendant.  T7-8.[1]  During the course of that investigation, the defendant was arrested

and placed in the back seat of an Amherst Police patrol vehicle with his hands cuffed

behind his back.  T8, 21.  At approximately 7:00 p.m., Officer Gilbert approached the

patrol car, leaned into the back seat, advised the defendant of his rights and inquired

whether the defendant "was interested in cooperating with us."  T10.  Specifically,

Officer Gilbert testified that he intended "to advise Mr. Gillon of his Miranda rights and

then to solicit his cooperation and to determine the role of his girlfriend who was in the

vehicle that evening."  T15-16.


        The following sets forth the relevant portions of the transcript of the

conversation between Officer Gilbert and the defendant, which was stipulated into

evidence at the suppression hearing:

> DG:   My name is Gilbert and I'm with the FBI Career
>       Criminal Task Force OK.  I'm going to read you your
>       rights OK.  Troy right?
>
>                                *   *   *
>
> DG:   Alright buddy.  You have the right to remain silent.
>       Anything you say can be used against you in court.
>       Anything you say can be used you (sic) in court (sic) if
>       you don't have – if you can't afford a lawyer one -
>       what are you doing.
>
>                                *   *   *
>
> DG:   Anything you say can be used against you OK.  If you
>       can't afford an attorney one will be appointed for you.
>       You have the right to answer questions now without
>       an attorney present.  If you choose to do so you can
>       stop doing (sic) at any time.  You understand your

_____

[1] "T" references the transcript of the hearing, which is located at Docket #25.

rights.  You've been through the drill before.  OK.
Obviously you've got major problem (sic) right now.

\*   \*   \*

TG:   I don't understand what you're saying.  You read me
      my rights about (sic)

\*   \*   \*

TG:   You read me my rights

DG:   I understand that dude

TG:   Well I don't know what to do, don't know where you're
      coming from now

\*   \*   \*

TG:   Listen I don't know where you're coming from
      because you just read me my rights one on one hand
      (sic) and then I you know I understand what your (sic)
      saying but I don't know what you want me to say

\*   \*   \*

TG:   I'm just trying to I'm trying to figure out where you're
      coming from right now.

DG:   Where I'm coming OK, where I'm coming from?

TG:   You read me my rights (inaudible) I don't know what
      you want me to say.

DG:   OK you have been through the system twice already.

TG:   Right

DG:   OK you know how it works

TG:   Yeah

DG:   If you can do something to help yourself right now,
      this is the time to do it because you're not going to
      see the outside.

-4-

TG:     What what (sic) do you want me to say?

DG:     When you get to the Magistrate tomorrow

TG:     What do you want me to say?

\*   \*   \*

TG:     Honest I'm trying but I don't know (inaudible) to say

\*   \*   \*

TG:     I don't understand what you, see listen, you read me
        my rights on one hand

DG:     That's correct

TG:     Now I'm trying to understand but I don't know what
        you want me say under those circumstances you read
        me my rights.

DG:     OK, alright, I told you, you are under arrest

TG:     Yes OK now yes rights

DG:     (inaudible)

TG:     Yes and now from there that's where were at right
        at this moment

DG:     That's correct

TG:     Now I don't know what you want me to say
        because what can I say

\*   \*   \*

TG:     You know what, all you got to do is talk to me were
        (sic) talking about nothing but a few words here mixed
        up with a little few words you read me my rights
        through (sic)

\*   \*   \*

TG:     All you have to do is talk to me

DG:   Alright dude that's what I'm saying

TG:   I don't understand what you want me to say though

\*   \*   \*

DG:   That's cool that's all I'm asking.  I was giving you the opportunity to tell me what time it was with your girl.

TG:   Alright, now OK, I didn't know exactly what you wanted me to do.

\*   \*   \*

DG:   Cousin, cousin I don't have a problem taking your girl to jail tonight.

TG:   I know that, but you want me to say one thing, and you kind of know we can't.

\*   \*   \*

DG:   Dude, you know what I don't have a problem, when I'm done tonight I'm going home and your not.  Dude, I'm trying to determine if your girl's going home tonight.  That's what I'm trying to determine.

\*   \*   \*

TG:   So, all you got to do is talk to me.

DG:   I tell you what . . .

TG:   But you read me my rights.

DG:   You know what (sic) before I talk to you I got to.

TG:   I know but where does that put me, saying, I can't, once you read me my rights what can I say.

DG:   You can say whatever you want to say.

TG:   No I can't.

DG:   Sure you can.

TG:     No, no I can't c'mon.

DG:     Dude, listen, if you want to invoke your right not to talk to me and answer a question, I'm gonna stop asking you questions.

*   *   *

DG:     I'm gonna ask you your DOB, your social security, how much you weigh, that kind of stuff, you know what I'm saying, pedigree.

TG:     We know everything, its all out, I just don't know, I'm a little confused right now.

DG:     Let me ask you this, we gonna be in a better scenario if we get in the car, go back to our office, we sit down and talk about this?

TG:     Me and you?

DG:     Yes.  About options.

TG:     Just me and you?

*   *   *

DG:     Yeah.

TG:     That's what I'm talking about.

Exhibit 1.


        At that time, Officer Gilbert was aware that the defendant had two prior federal court convictions,[2] as well as prior state arrests.  T17, 19.  Officer Gilbert admitted that the defendant "was definitely uncomfortable in the back of the car" and

_____

        [2] The parties stipulated to admit the following judgments of conviction from the Western District of New York for the limited purpose of demonstrating that the defendant has a criminal record: 94-CR-178 and 99-CR-136.  T24-25.

was "complaining about the leg room."  T21-22.  He explained that the defendant was "handcuffed behind his back."  T21.

FBI Special Agent J. Peter Orchard testified that Officer Gilbert informed him that the defendant had been advised of his rights and asked that the defendant be transported to the CCTF office for processing.  T19, 27-28.  Agent Orchard did not converse with the defendant at the scene.  T27.  When they arrived at the CCTF office, Agent Orchard asked the defendant "if he was going to help himself out."  T28.  During the ensuing conversation, the defendant made the statements currently sought to be suppressed.  T29.  Agent Orchard testified that the defendant did not ask for an attorney, never stated that he did not want to answer questions and never indicated in any form or fashion that he no longer wished to speak with the officers.  T31-32. Although Agent Orchard testified that the defendant "kept asking us to work something out," he determined that it would not be possible for the defendant to cooperate with the CCTF and transported the defendant to the Erie County Holding Center.  T32-33. Specifically, Agent Orchard explained that "we were at the point that without total one hundred percent cooperation, there was nothing we really could do, and it was time to go to jail."  T33.

At the government's request, Agent Orchard retrieved two waiver of rights forms executed by defendant in relation to arrests in 1994.  T35.  Agent Orchard also produced a copy of a 1994 "FD302 report of investigation" indicating that defendant was asked if he would be willing to answer questions without his lawyer present and

-8-

declined.  T38.  Agent Orchard conceded that "the FBI has a practice of asking

individuals to put in writing when they want to waive their right to remain silent," but

explained that he did not obtain such a waiver because "I was told he was [sic] already

had been advised of his rights and was willing to give some information." T40-41.

Agent Orchard did not advise the defendant of his rights nor did he obtain a signed

waiver of rights.  T42.


## DISCUSSION AND ANALYSIS

The United States Supreme Court directed in *Miranda v. Arizona* that the

following occur when custodial interrogation is to be undertaken:

> Prior to any questioning, the person must be warned that he
> has a right to remain silent, that any statement he does
> make may be used as evidence against him, and that he
> has a right to the presence of an attorney, either retained or
> appointed.  The defendant may waive effectuation of these
> rights, provided the waiver is made voluntarily, knowingly
> and intelligently.  If, however, he indicates in any manner
> that he does not wish to be interrogated, the police may not
> question him.  The mere fact that he may have answered
> some questions or volunteered some statements on his own
> does not deprive him of the right to refrain from answering
> any further inquiries until he has consulted with an attorney
> and thereafter consents to be questioned.

384 U.S. 436, 444 (1966).  "Any statements obtained during custodial interrogation

conducted in violation of these rules may not be admitted against the accused, at least

during the State's case in chief." *Fare v. Michael C.*, 442 U.S. 707, 718 (1979).


The issues to be resolved in the case at bar are whether there was a full

and effective warning given to the defendant by the arresting officers as required by

*Miranda v. Arizona,* and if so, whether the defendant voluntarily and knowingly waived

his rights or indicated "in any manner" that he did not wish to be interrogated.[3]


As the United States Supreme Court has stated, "*Miranda* itself indicated

that no talismanic incantation was required to satisfy its strictures."  *California v.*

*Prysock*, 453 U.S. 355, 359 (1981); *see also Duckworth v. Eagan,* 492 U.S. 195, 202

(1989); *United States v. Lamia*, 429 F.2d 373, 375 (2d Cir.), *cert. denied*, 400 U.S. 907

(1970).  However, the warnings given must "touch[] all of the bases required by

Miranda."  *Duckworth,* 492 U.S. at 203.  "The inquiry is simply whether the warnings

reasonably 'conve[y] to [a suspect] his rights as required by Miranda.'"  *Id., quoting*

*Prysock*, 453 U.S. at 361.


In the instant case, Officer Gilbert advised the defendant as follows:

> DG:    Alright buddy.  You have the right to remain silent.
> Anything you say can be used against you in court.
> Anything you say can be used you (sic) in court (sic) if
> you don't have – if you can't afford a lawyer one -
> what are you doing.

*   *   *

> DG:    Anything you say can be used against you OK.  If you
> can't afford an attorney one will be appointed for you.
> **You have the right to answer questions now**
> **without an attorney present.**  If you choose to do so

---

[3] Although defendant's attorney submitted an affirmation (Docket #9), claiming that the defendant "made an unambiguous request to speak to his lawyer" after receiving *Miranda* warnings, and moved to suppress defendant's statements on the ground, *inter alia*, that they were obtained in violation of his right to counsel pursuant to the Sixth Amendment to the United States Constitution, neither the transcript of the recording taken from the Amherst Police patrol vehicle nor the testimony obtained during the suppression hearing provide any evidence to support this assertion.  Accordingly, the Court's analysis will focus upon the alleged Fifth Amendment violation.

> you can stop doing (sic) at any time.  You understand
> your rights.  You've been through the drill before.  OK.
> Obviously you've got major problem (sic) right now.

Exhibit 1 (emphasis added).  Thus, although the defendant was advised that he could

answer questions without an attorney present, he was not advised that he had the right

to have an attorney present while being questioned.


"[T]he right to have counsel present at the interrogation is indispensable to

the protection of the Fifth Amendment privilege . . . ." *Miranda*, 384 U.S. at 469.

Accordingly, the Supreme Court held

> that an individual held for interrogation must be clearly
> informed that he has the right to consult with a lawyer and to
> have the lawyer with him during interrogation . . . .  As with
> the warnings of the right to remain silent and that anything
> stated can be used in evidence against him, this warning is
> an absolute prerequisite to interrogation.  No amount of
> circumstantial evidence that the person may have been
> aware of this right will suffice to stand in its stead.  Only
> through such a warning is there ascertainable assurance
> that the accused was aware of this right.

*Miranda*, 384 U.S. at 471-72.  Thus, evidence of the defendant's receipt of *Miranda*

warnings during the course of prior arrests years ago, as well as evidence of both

defendant's 1994 waiver and 1994 refusal to waive his rights under the Fifth

Amendment is insufficient to overcome the failure to advise him of this right prior to

questioning in connection with this arrest.


"[A] heavy burden rests on the government to demonstrate that the

defendant knowingly and intelligently waived his privilege against self-incrimination and

his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475.  "The courts must

presume that a defendant did not waive his rights; the prosecution's burden is great; but

in at least some cases waiver can be clearly inferred from the actions and words of the

person interrogated." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).  Only if the

totality of the circumstances surrounding the interrogation reveal both an uncoerced

choice and the requisite level of comprehension, *to wit*, an understanding of both the

nature of the right being waived and the consequences of his waiver, may a court

properly conclude that the *Miranda* rights have been waived.  *Moran v. Burbine*, 475

U.S. 412, 421 (1986).  The prosecution bears the burden of proving the *Miranda* waiver

at least by a preponderance of the evidence.  *Colorado v. Connelly*, 479 U.S. 157, 168

(1986).


Applying these principles, the Court of Appeals for the Second Circuit has

explained the appropriate protocol as follows:

> If, before or during the interrogation, the suspect states
> unequivocally that he wishes to remain silent and refuses to
> answer questions, interrogation ordinarily must cease.  A
> suspect need not rely on talismanic phrases or any special
> combination of words to invoke his Fifth Amendment right to
> remain silent.  We have ruled, for example, that a suspect
> who acknowledged that he understood his Miranda rights by
> nodding and then remained silent in response to all pedigree
> question had thereby sufficiently asserted his right to remain
> silent.  Once a suspect has unequivocally invoked his right
> to remain silent "whether in the form of refusing to answer
> questions or asking that an ongoing interrogation be
> terminated, his request must be scrupulously honored.
>
> In some circumstances it may be unclear whether a suspect
> has invoked his right to remain silent.  We have stated that

> where a suspect has invoked his right equivocally or
> ambiguously, the officers are permitted to ask narrow
> questions only for the purpose of clarifying ambiguity.

*United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir.) (internal quotations and citations

omitted), *cert. denied*, 519 U.S. 850 (1996).


      In the instant case, even if the *Miranda* warnings had been recited

completely, the prosecution has failed to establish, by a preponderance of the

evidence, that the defendant knowingly and voluntarily waived his constitutional right to

remain silent.  To the contrary, the transcript of the conversation between the defendant

and Officer Gilbert reveals that the defendant repeatedly indicated his confusion about

what Officer Gilbert wanted him to say and his concern about saying anything

subsequent to receipt of the *Miranda* warnings.  Exhibit 1.  The following exchange is

indicative:

      TG:    But you read me my rights.

      DG:    You know what (sic) before I talk to you I got to.

      TG:    I know but where does that put me, saying, I can't,
               once you read me my rights what can I say.

      DG:    You can say whatever you want to say.

      TG:    No I can't.

      DG:    Sure you can.

      TG:    No, no I can't c'mon.

Exhibit 1.  At that point, Officer Gilbert recognizes the defendant's reticence to speak,

stating: "listen, if you want to invoke your right not to talk to me and answer a question,

-13-

I'm gonna stop asking you questions."  Exhibit 1.  Thereafter, the defendant repeats, "I just don't know, I'm a little confused right now."  Exhibit 1.

As a result of the foregoing, the law enforcement officers should not have continued questioning the defendant without first clarifying that he understood his rights and was willing to waive them.  *See, e.g., Campaneria v. Reed*, 891 F.2d 1014, 1021 (2d Cir. 1989) (law enforcement officer's remark that "If you want to talk to us, now is the time to do it" was not aimed at resolving any ambiguity in defendant's statement, "No, I don't want to talk to you now, maybe come back later," but rather at changing defendant's mind, which was precisely the sort of conduct *Miranda* seeks to prevent), *cert. denied*, 499 U.S. 949 (1991); *United States v. De Santis*, 2000 WL 1863538, at *5 (S.D.N.Y. Dec. 20, 2000) (Asking the suspect questions about the case was an impermissible response to the defendant's statement that the FBI could ask questions, but he was not going to say anything to the FBI because he would not hurt his friends). Instead, defendant was transported from the scene of his arrest to the CCTF office where a different law enforcement officer continued questioning him about the circumstances of his arrest without any further discussion as to the defendant's understanding of and willingness to waive his constitutional rights.  *Cf. Mosley v. Michigan*, 423 U.S. 96, 103-04 (1975) (right to cut off questioning scrupulously honored by resumption of questioning regarding different crime after the passage of a significant amount of time and the provision of fresh warnings).

Finally, the Court finds unsupportable, as a matter of both fact and law, the government's argument that the defendant made "spontaneous voluntary statements" following Agent Orchard's determination that the defendant should be transported to jail because he was unwilling or unable to cooperate to the satisfaction of the CCTF.  *See* Docket #27, p.6.

## CONCLUSION

Based on the foregoing, it is hereby **RECOMMENDED** that defendant's motion to suppress (Docket #9), be **GRANTED** and it is hereby

ORDERED pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to

the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order</u>.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **<u>Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.</u>**

/s/ H. Kenneth Schroeder, Jr.

_____
**H. KENNETH SCHROEDER, JR.
United States Magistrate Judge**

**DATED:**     **Buffalo, New York
December 21, 2005**